WILSON, J. (dissenting).
I fully join in Judge Rivera's dissent, but write separately to explain why, irrespective of the atrocious quality of appellate counsel's brief and the abject failure of appellate counsel to communicate with Mr. Alvarez, counsel's failure to ask the Appellate Division to reduce Mr. Alvarez's sentence in the interest of justice was, standing alone, ineffective assistance of counsel.
***308 I.
Our Legislature, in section 470.15 of the Criminal Procedure law, granted the Appellate Division an extraordinary power - one usually confined to the head of state: the power to reduce sentences as a matter of discretion in the interests of justice. The statute was passed in 1970 as a recodification of NY Code of Criminal Procedure § 543, which gave appellate courts that same power, though stated in a tortuous manner.[1]
*134 Article VI of the New York State Constitution created a unique wrinkle in that authority. In People v. Speiser, 277 N.Y. 342, 14 N.E.2d 380 [1938], we held that we, the State's highest court, lacked the power to review Appellate Division decisions reducing sentences as excessive. We explained:
"Under this statute, the Appellate Division has complete jurisdiction to reduce the sentence imposed upon this defendant. In examining the power of this court, however, section 543 must be read in connection with sections 7 and 8 of article VI of the Constitution. Pursuant to section 7, except where the judgment is of death or where, in civil actions, the Appellate Division, on reversing or modifying, makes new findings, our jurisdiction **719 is limited to the review of questions of law. The provisions of section 8 which confer upon 'any appellate court' the power to modify a judgment must necessarily exclude power by this court to modify on questions of fact or discretion except in the two instances provided for in section 7. In reviewing a judgment of conviction for a misdemeanor or for a felony other than a capital offense, we can no more review the appropriateness of a discretionary sentence thanthe ***309 weight of evidence or other elements which do not include questions of law." ( 277 N.Y. 342, 344, 14 N.E.2d 380 ).
Section 543 was subsequently recodified in CPL 470.15,[2] with the Appellate Division's unfettered power to reduce sentences in the interest of justice more plainly stated:
"Upon an appeal to an intermediate appellate court ... the intermediate appellate court must either affirm or reverse or modify the criminal court judgment, sentence or order...
''Upon a determination that a sentence imposed upon a valid conviction is illegal or unduly harsh or severe, the court may modify the judgment by reversing it with respect to the sentence and by otherwise affirming it."
This creates in New York a peculiar, dramatic, and powerful authority of the Appellate Division to ensure the fairness of criminal sentences, one that operates completely outside our purview. We are powerless to review the Appellate Division's exercise of that jurisdiction, and indeed we cannot even prescribe factors to be taken into account by the Appellate Division when exercising it. We can, however, review an attorney's failure to petition the Appellate Division to reduce a sentence in the interest of justice, and decide whether, in a given case, that failure falls below what a minimally competent attorney would do.
II.
Ninteen-year-old Omar Alvarez was convicted of 9 counts of an indictment broadly charging him and others as members of a drug-dealing conspiracy known as the Yellow Top Crew, YTC, or Young Talented Children; one count was for first-degree homicide of a 14-year-old bystander. He was sentenced to 66 and 2/3 years in prison, meaning that he would be eligible for parole at the age of 87. His was, in reality, a life sentence without the possibility of parole. Indeed, at sentencing, the trial court made clear that was its goal. The court explained that Mr. Alvarez was "beyond rehabilitation" and that he "[needed] to be removed from the streets indefinitely, so that you can never return to the streets of our city[.]" The court also asked *135 the Parole Board to "not let these defendants out. Please make them serve their maximum sentence under law[.]" ***310 Both now and when Mr. Alvarez appealed, the People contended the points raised on appeal were meritless. What strategic reason, then, might a competent lawyer have to refrain from asking the Appellate Division to reduce the lower end of his sentence, say, to 40 years to life so that, at age 59, the Parole Board would have the opportunity to consider whether Mr. Alvarez had been rehabilitated, would not pose a danger to society if released, had been sufficiently punished, and should not continue to be imprisoned at a substantial cost to taxpayers?
Here, the People have two answers. The first is to list some reasons the Appellate Division would have denied his request. But those are not a reason to refrain from **720 making the request: whether the argument would have changed the outcome is not the proper inquiry ( People v. Borrell, 12 N.Y.3d 365, 368, 881 N.Y.S.2d 637, 909 N.E.2d 559 [2009] ). The question is whether counsel's choices are consistent with those of a minimally competent attorney. That question is answered by the old saw, "nothing ventured, nothing gained."
The People's second answer is that Mr. Alvarez's appellate lawyer may have made the strategic decision not to dilute his merits arguments by making a plea in the interest of justice. That answer is particularly unsatisfactory in light of the wholly frivolous arguments counsel did raise. For example, Point 1 of the appellate brief argued the police were not permitted to search the immediate area "controlled by" Mr. Alvarez upon his arrest. Even leaving aside the argument's utter lack of merit, had Mr. Alvarez miraculously prevailed on that argument, it would have, at most, resulted in a reversal on the weapons possession charge, which, because that sentence ran concurrently with the others, would not have shortened Mr. Alvarez's prison term by a day.
III.
Because I have great faith in the commitment of the Justices of our Appellate Division to the interests of justice, I do not conclude that a request by Mr. Alvarez to reduce the minimum term of his sentence would have been doomed to failure. Had that relief been granted, Mr. Alvarez might still have spent the rest of his life in prison if the circumstances warranted, but we would not be forced to keep him incarcerated if the circumstances sufficiently changed.
The United States Supreme Court has articulated three key differences between youthful offenders and their adult counterparts:
***311 First, children have a "lack of maturity and an underdeveloped sense of responsibility," leading to recklessness, impulsivity, and heedless risk-taking. Second, children "are more vulnerable ... to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as "well formed" as an adult's; his traits are 'less fixed' and his actions less likely to be 'evidence of irretrievabl[e] deprav[ity].' " ( Miller v. Alabama, 567 U.S. 460, 471, 132 S.Ct. 2455, 183 L.Ed.2d 407 [2012] [citing Roper v. Simmons, 543 U.S. 551, 569, 125 S.Ct. 1183, 161 L.Ed.2d 1 [2005] [quotations omitted] ).
These gaps between adult and youthful offenders weaken each of the justifications for perpetual imprisonment.
*136 "The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender" ( Tison v. Arizona, 481 U.S. 137, 149, 107 S.Ct. 1676, 95 L.Ed.2d 127 [1987] ). The degree of retribution appropriate for an adult is not appropriate for youthful offenders, because the parts of the brain concerned with behavior control have not yet fully developed in them ( Graham v. Florida, 560 U.S. 48, 68, 130 S.Ct. 2011, 176 L.Ed.2d 825 [2010] ). "Whether viewed as an attempt to express the community's moral outrage or as an attempt to right the balance for the wrong to the victim, the case for retribution is not as strong with a minor as with an adult" ( Roper v. Simmons, 543 U.S. 551, 571, 125 S.Ct. 1183, 161 L.Ed.2d 1 [2005] ). Likewise, the state's interest in deterrence is significantly diminished when punishing a young offender, who is unlikely to be deterred by the threat of stiff punishments for transgressions ( **721 Graham, 560 U.S. 48, 72, 130 S.Ct. 2011, 176 L.Ed.2d 825 ). The state interests in incapacitation and rehabilitation are also different when dealing with young defendants, because, compared to fully-formed adults, youths have a greater capacity for change. Thus, sentencing schemes that mandate life in prison without the possibility of parole are unconstitutional when applied to juveniles (see Miller v. Alabama, 567 U.S. 460, 473, 132 S.Ct. 2455, 183 L.Ed.2d 407 ).
The Supreme Court made the above points with respect to juveniles under the age of 18, but that line, like all such lines, is necessarily arbitrary and cannot account for variations in the maturation of individuals. The scientific conclusions about brain development for adolescents entering adulthood present ***312 similar concerns for young adults entering their early 20's. Researchers examining brain development in the years immediately after 18 suggest that "young adulthood is a time when cognitive control is still vulnerable to negative emotional influences, in part as a result of continued development of lateral and medial prefrontal circuitry" (Alexandra O. Cohen et al., When is an Adolescent an Adult? Assessing Cognitive Control in Emotional and Nonemotional Contexts , 27 Psychol Sci [Issue 4] 549, 559 [Apr. 2016] ). Indeed, the areas of brain development that concerned the Supreme Court in its discussion of criminal penalties for young offenders - those that govern impulsivity, risk-taking, and susceptibility to social coercion - are also those that typically develop later, including into young adulthood (Laurence Steinberg et al., Are Adolescents Less Mature Than Adults? Minors' Access to Abortion, the Juvenile Death Penalty, and the Alleged APA "Flip-Flop," 64 Am Psychol [Issue 7] 583, 587 [Oct. 2009] ).
Many other countries have adapted their legal systems to account for the scientific evidence. In Austria, Belgium, England and Wales, France, Hungary, Italy, Germany, Portugal, Sweden, and Switzerland, governments have put in place special rules mitigating penalties for young adults over the age of 18 (T2A: Transition to Adulthood, Better in Europe? European responses to young adult offending [Mar. 2, 2015], available at https://www.t2a.org.uk/wp-content/uploads/2016/02/T2A_Better-in-Europe.pdf [accessed March 7, 2019] ). Those rules are widespread enough, that in 2007 the United Nations Committee on the Rights of the Child "note[d] with appreciation that some States parties allow for the application of the rules and regulations of juvenile justice to persons aged 18 and older, usually till the age of 21, either as a general rule or by way of exception" (UN Committee on the Rights of the Child [CRC], General comment No. 10 [2007]: Children's Rights in Juvenile Justice, 25 April 2007, CRC/C/GC/10, *137 available at : https://www.refworld.org/docid/4670fca12.html [accessed 7 March 2019] ). Although the Supreme Court's decisions, international policies, and much of the scientific research proving that young people should not be held to the same standard as adults postdates Mr. Alvarez's conviction, the Appellate Division never has been constrained to accept the proposition that sentencing a 19-year-old to life without parole (or a functionally equivalent minimum term of years) is in the interest of justice (cf. Oscar Wilde, Children in Prison and Other Cruelties of Prison ***313 Life , Murdoch & Co., London, 1897 at 6 ["The present treatment of children is terrible, primarily from people not understanding the peculiar psychology of a child's nature. A child can understand a punishment inflicted by an individual, such as a parent or guardian, and bear it with a certain amount of acquiescence. What it cannot understand is a **722 punishment inflicted by Society. It cannot realise what Society is"] ).[3]
The Supreme Court, and indeed much of the rest of the world, considers the youth of a defendant to be an important factor when considering the appropriate punishment. Our jurisprudence should do the same. The majority, in contrast, does not mention Mr. Alvarez's age when he committed his crimes.
IV.
Mr. Alvarez's life graphically illustrates why it is morally wrong to prejudge the entire future of a 19-year-old. Mr. Alvarez has been incarcerated almost 25 years, during which time he has completed rehabilitative programs including Alternatives to Violence, Action for Personal Choice, Substance Abuse Counseling, a Pre-GED Class, Computer Technology, Computer Lab, Computer Repair, and Barber Shop training. In those programs, Mr. Alvarez has received uniformly positive reviews. He also has a positive disciplinary record.
While in prison, Mr. Alvarez has also become gravely ill. He suffers from Hodgkin's Lymphoma. His cancer was not diagnosed until it had already metastasized and caused compression around his spinal cord. As a result, Mr. Alvarez is a paraplegic. He does not have the use of his lower extremities, and he cannot control his bladder or bowels. He is wheelchair bound, in constant pain, and under full-time medical care.
***314 Mr. Alvarez's rehabilitation as a father and husband is also extraordinary. While in prison he reconnected with Diana Alvarez, an old acquaintance; they were married in 2006. With Ms. Alvarez, he has a daughter, and he has been a loving father and stepfather to her and Ms. Alvarez's daughter from a prior relationship. Before his illness, he was able to have *138 regular weekend trailer visits with his family, thanks to his good conduct in prison. His family is also the reason this case is even before us. It was Diana Alvarez who helped Mr. Alvarez research his appeal and discover it had concluded without his knowledge. She wishes to care for him at home.
The majority does not mention those facts. It would be worth dissenting if only to acknowledge them, but that is not my point in so doing. Of course, those facts were unknowable at the time Mr. Alvarez was sentenced, and most were unknowable at the time his appeal was denied, 4 years later. But all knew he was 19 years old when he committed his crimes. The possibility of a transformation like Mr. Alvarez's is precisely why our system should rarely if ever sentence young people to life without some realistic opportunity to seek parole.
**723 On this appeal, Mr. Alvarez has not asked to be granted parole. He has not even asked to be granted a chance to ask the Parole Board to consider paroling him. Instead, he has asked for permission to ask the Appellate Division what his patently ineffective counsel neglected to ask: that, while leaving the maximum life term of his sentence in place, the Appellate Division reduce the minimum 66 2/3-year term in the interest of justice, so that someday he might be able to prove to the Parole Board that both he and society would be better off terminating his incarceration short of his death. Had we granted Mr. Alvarez's coram nobis petition, allowing him to ask the Appellate Division to reduce his sentence in the interest of justice, the Appellate Division could have considered all the facts I outline above, or others. As discussed, we have no power to review the Appellate Division's exercise of its interest-of-justice jurisdiction or to limit the factors it might consider in exercising its discretion to reduce a sentence in the interest of justice. It would be entirely up to the Appellate Division to determine whether facts that occurred after Mr. Alvarez's original appeal could be considered.
V.
A holding that the failure to seek a sentence reduction in the interest of justice automatically renders appellate representation ***315 ineffective would, contend the People, open a Pandora's Box. They are right. I advocate no such rule. The law advances one case at a time; granting Mr. Alvarez's petition would be just one of Holmes' "sybelline leaves": a 19-year-old with no viable merits-based argument, effectively sentenced to life without parole, living in a state in which the legislature has empowered its intermediate appellate Justices to live up to their titles, has a constitutional right to a lawyer who will ask those Justices for a measure of mercy, be it only the chance at age 60 to demonstrate to the satisfaction of the Parole Board that further imprisonment is unjustified. Where we draw the line can await the next case; here, the lawyer's defalcation in failing to ask for a reduction of the minimum sentence, to allow for the consideration of parole at some point within Mr. Alvarez's lifetime, is patently ineffective assistance of counsel. Were you Mr. Alvarez's lawyer, would you believe you competently represented him, as required by the ethical rules ( 22 NYCRR 1200.0 [Rule 1.1] )? Were Mr. Alvarez your son, would you have instructed his lawyer not to ask the Appellate Division to exercise its interest of justice jurisdiction to give him the chance to prove he had earned parole? I, for one, believe he should have such a chance someday. Even poor Pandora was left, in the end, with the aid of the one deity the majority today denies Mr. Alvarez. *139 For the reasons expressed in Judge Rivera's dissent and here, I too dissent.
Chief Judge DiFiore and Judges Fahey, Garcia and Feinman concur; Judge Rivera dissents in an opinion, in which Judge Wilson concurs in a separate dissenting opinion.
Order affirmed.

The brief that defendant's counsel filed on his behalf in his original appeal is available here: http://www.nycourts.gov/ctapps/reference/Alvarez%20Brief.pdf. The brief is also permanently available for viewing at the New York State Library. The Library is the repository for all court filings: http://www.nysl.nysed.gov/recbrief.htm.

The Appellate Division denied defendant's petition, suggesting that it rejected the People's argument that the petition should be dismissed based on laches.

The majority claims that I have engaged in speculation about appellate counsel's years-long failure to communicate with his client (majority op. at 291, n. 3, 101 N.Y.S.3d at 706-07 n. 3, 125 N.E.3d at 121-22 n. 3). The majority ignores the totality of my analysis, which focuses on several key factors: counsel's dilatory conduct was established by the Appellate Division's warning letter that defendant's appeal was at risk of dismissal for counsel's failure to perfect; counsel's hurried reaction which consisted of a cursory letter to defendant, one that lacked even a semblance of an attorney-client relationship as it failed to acknowledge any prior communication and did not explain why the appeal was noticed for the dismissal calendar; and the eventual submission of a slapdash writing that counsel had the temerity to represent as an appellate brief. If what the majority means by speculation is an unjustified assumption, then it is the majority that has faltered in its analysis by assuming that appellate counsel conducted himself in a professional manner when all evidence is to the contrary.